Our fifth case for argument today is Medical Protective Company against AIG Specialty Insurance. Mr. Collins. May it please the court, good morning, Joe Collins on behalf of Appellant Aislik. This is the court's second review of this case involving a contract dispute between two sophisticated insurance companies, MedPro and Aislik. Given the court's familiarity with the background of this case. MedPro and what? Aislik. I thought the current name of the defendant is AIG Specialty Insurance. That's what the certificate of interest says. Shouldn't we call things what they are? Could I say American International or would you like me to? You can say that too, although the certificate of interest says that its name is AIG rather than American International. Right. If you put the initials in the name, then it's the name, sad to say. The Great Burlington Northern Railroad is now BNSF, B-N-S-F. And there we are. I refer to the appellant as Aislik if that, I mean, as AIG, if that's okay with your honor. Sure. Given the court's familiarity with the background of this case and the limited argument I have today, I'd like to delve into the two discrete issues presented for review. First issue is the district court's ruling that the claim against MedPro was not first made prior to the July 1st, 2006 inception date of the policy. MedPro seeks coverage under an AIG professional liability policy for a $6 million settlement of a bad faith claim made against in connection with MedPro's rejection of a $200,000 policy limit demand. Because the policy is a claims made insurance policy, if the claim is first made before July 1st, 2006, the claim is not covered under the policy. The policy does not define the word claim, but Indiana courts have understood a claim to mean a demand for money or property or some specific relief accompanied by an allegation of wrongdoing. Therefore, any demand written or oral made against MedPro for money or some specific relief accompanied by an allegation of wrongdoing qualifies as a claim under the common law. Here- Mr. Collins? Yes. I guess my question is, where in the sequence of events here do you think the claim was presented before July 1st of 2006? So we've got kind of the, we've got the Stowers demands, we've got the Stowers threat letters. Then we have the verdict in the trial court in the Texas court in the Bramlett action. Where in that sequence do you think the claim was made? Well, with respect to the Bramlett's in 2005, in February, 2005, a claim was made in a February 2005 pretrial mediation where 2.3 million was demanded from MedPro directly. And in the September, 2005 post verdict mediation, MedPro received a $6.9 million demand from the Bramlett's. And significantly MedPro countered the 6.9 million in December, 2005 with a $1.6 million settlement offer. So simply put, MedPro attempted to settle the Bramlett's claim for seven figures over six months prior to the inception of the policy. That was, I'm not quite sure in your logic, which, which of those should be controlling, but with the district court seeming to focus on, you know, whether the Bramlett's had a right cause of action, I don't know, I'm, I'm, I'm struggling with, with where on that continuum, the claim was made. Either one qualifies as the same claim. In our view, the amount demanded in terms of dollars changed, but both were based on the rejection of the policy limits demand. So our argument would be with respect to the Bramlett's, the earliest claim was made in prior to the inception of the policy. Standing does not fall into the definition of a claim under the common law, a claim would be. What does, what significance do you give the letter in December of four from Dr. Phillips lawyer? Yes. With respect to Dr. Phillips, there were two specific demands that were notable. One was in December, 2004, as you noted, he demanded that due to the rejection of the policy limits demands, MedPro should pay the Bramlett's extra contractual dollars. There was also a similar letter in 2005, demanding that MedPro accept the lowest of the Bramlett's multimillion dollar settlement demands, again, due to the rejection of the policy limits demand. Okay. So is it, is it your view, we're, we're told by the other party here that this, these letters were so-called hammer letters. These are routine in Texas liability litigation. Is it your view that in essence, any Stowers letter or post Stowers denial demand like that should, should be treated as a, as a demand, as a claim that where the insurer's liability insurer needs to have notice of it? If, if there's a, a demand for relief based on an allegation of wrongdoing, our position is that meets the common law definition of a claim. Whether every hammer letter constitutes a claim would demand, would depend on what's in the letter. A typical hammer letter could be that if there is an extra contractual judgment or verdict, we expect you to, you know, take care of us throughout the remainder of the case. There may not be any reference to any wrongdoing there. There may be threats of, of, of future claims. There might be a future demand. There may not be a demand at all. So I wouldn't say every hammer letter constitutes a claim, but these specific communications constituted a claim under the Indiana's concept of what constitutes a claim and undefined term under the common law. So I'm looking for a brighter line that an insured can try to follow. You're telling me it's not very bright. No, I think it is. If there's an, a demand for a specific relief, either monetarily or some other type of relief based on allegations of wrongdoing, that is a claim. And whether a specific demand is a claim would demand on the facts and circumstances of the contents of the letter or what was said during the discussions. Need a specific dollar amount? No. Just pay extra contractual pay, but pay more than the policy limit. Well, the demand for indemnification that Dr. Phillips asked, for example, would be a demand for some other relief, a demand to pay the lowest of the Bramlett settlement offers. That wasn't a specific amount, but it was get the best deal you can. But we expect you to pay the lowest amount the Bramlett's are willing to take. And again, whether you have standing in bad faith claims, demands are made all the time prior to a formal lawsuit, oftentimes demands are made based on allegations of wrongdoing before a formal lawsuit is filed. And the insured can decide whether or not to tender that claim. If it doesn't think it has merit, it can choose to or not to at its peril. But here, again, MedPro actually attempted to settle the claim prior to the inception of the policy. I only have a few minutes left, so I would like to address the law of the case argument. As set forth in the briefs, we're not here to contest this court's prior ruling, but the district court took the same exact language, any wrongful act, and interpreted it in a manner differently than this court did in its prior opinion. Therefore, you have two different policy provisions with the same exact language being interpreted in different ways. That not only goes against the law of the case doctrine, it also goes against Indiana law that policy provisions should be harmonized and not in conflict with each other. And as we stated in our briefs, not only in the Spurgeon case, but also in the case where one policy provision, one defined term, or a term in a policy can't be interpreted one way in one policy provision and differently in another policy provision. That's the Shockley case that this court affirmed, where an insured argued that the insured's had the definition of resident and insured person under coverage provisions, but didn't meet those same definitions for exclusions. And the district court rejected that argument, finding that such a selective and arbitrary interpretation would lead to illogical results. This court affirmed that ruling. And so if you decide the claim was made prior to the inception of the policy, we would ask you to reverse, but as an independent ground, because the district court did not follow the law of the case, we, too, would seek reversal based on that independent ground. Thank you, Mr. Collins. Thank you. Your Honor, your court, Jack Gerstein on behalf of the Medical Protective Insurance Company of Fort Wayne, Indiana. There's a quick answer to this last point counsel made, which is there's nothing incongruous between a finding of coverage under the coverage grant and the applicability of exclusion M as this court defined it. The coverage grant covers claims for a wrongful act. The wrongful act is defined as negligence, breach of duty, or the like. The Bramlett claim was a claim for negligence and breach of duty, so the test was met. That's the easy answer to that. With respect to their other point on claim first made, while you asked counsel what he thought a demand letter was, whether it could be a claim, interestingly, when the AI, and this was undisputed, the AIG 30B-6 witness. Mr. Gerstein. Mr. Gerstein. Sorry. Yes. We, the prior panel, remanded for a jury trial on whether there was a wrongful act, and the jury checked the box saying no. I wonder why that doesn't end the suit. We said there was a triable issue, AIG prevailed on the triable issue. What is left of this litigation? I'm sorry. Well, we prevailed. Just to be clear, MedPro prevailed on the issue. We found, the jury found that we had not committed a wrongful act. Sorry. Yeah. The jury found there was no wrongful act. I think I agree with you. I believe this should be summarily affirmed. I agree with that. They haven't challenged the conduct of the trial. The judge, frankly, did a superb job. And I gather there is also no, no contest to the jury instructions. That's correct. And no request for any other verdict form. I look to see whether there was that. That's correct. I completely, honestly, I completely agree. The court has any other questions? I would, just so the records would be helpful, just so that you know, the AIG corporate witness said a demand to settle the underlying claim in whatever amount is not a claim against MedPro. It's a claim related to the underlying insurer. It's not a claim under the policy. MedPro's defending people in the tort system, it disclosed in its application that such verbal threats were commonplace in its practice. Those are not claims under the Dillon case. How would that work with the relationship between MedPro and its insured doctors? I'm imagining a letter sent to a doctor that you insure a lawyer rights and says, doctor, you really botched my client's operation and you should pay damages to her, to my client. No lawsuit has been filed yet. I assume you would expect your doctor insured to treat that as a demand and a claim and inform you if you're going to take over defense and indemnification. Well, it's interesting you bring that up because we asked the MedPro person, the AIG person, the corporate witness, that exact question, because our point was we are defending our MedPro is defending its insureds in the tort system. If every time there was a demand that it had turned down, it was accused of negligently turning it down. Let me pursue the parallel a little further. And that is the doctor's response is, I didn't do a thing wrong. I have faced no exposure about this. And so the doctor doesn't tell you about the claim. Every liability insurance company I've ever seen would wind up rejecting a late claim, right? That would be a claim of right. The person is implicitly saying you did something wrong. If you don't settle with me now, I can sue you tomorrow. That's the claim of right. And how is that different from Dr. Phillips' letter, say, in 2004 or different from what is implied by MedPro's offer to for more than the policy coverage after the verdict in 2005? Because in each instance, MedPro is defending its insured in the tort system. And the AIG witness said that's not a claim under its policy. Whatever the demand is there, it's negotiating leverage. If MedPro had complete, if the insured had completely won the appeal, it would be, had it won the trial, there would be no argument. Prior to the Supreme Court of Texas ruling in the Bramlett matter, the law had been in Texas. If the insurance company protected its insured fully, there was no Stowers claim. MedPro paid 100 percent of what its insured owed under the judgment. Prior to the Supreme Court's decision, there would have been no law in Texas reported at the time that would have made it liable for monies its insured didn't even owe. And if you look at the Bramlett Supreme Court decision under the paragraph where it talks about the conundrum caused by the limits capping statute, it makes that point. The court says under traditional Stowers law, there is no common law claim for the claim, the plaintiff to recover monies the insured doesn't owe. And, but it found a conundrum in the way the statute was worded. It's since been amended to make clear that this result was never intended to happen. But that statute, they said, gee, it looks like there has to be some way to bring the Stowers claim. So they minted, that's the, I think the plaintiff's phrase, they minted a new cause of action under that statute and said,  so nobody prior to the Bramlett claim was making any claim of right, which under Indiana law, under the Dillon case, that has to be the Phillips's were saying, were basically saying, you should pay now or down the road, there could be a problem. The Bramlett's were saying the same thing. They're all the Phillips's lawyer said they never made a claim. The Bramlett's lawyer said he didn't even have a claim. Action until the Supreme court thing, because there had been no assignment. There had been no bankruptcy and a turnover. Nobody was making a claim of right. These are traditional hammer letter type discourse. And AIG is a sophisticated insurer new from dealing with my client, a sophisticated insurer. That's a commonplace. And I even asked the AIG witness, it says here, you can take over a claim. If we present it, you can decide you want to defend it. If we had tendered to you this dower's demand and the nasty letters to follow, would you have been able to take over the claim? And she said, no, because that's not a claim under this policy. It's a claim in the underlying litigation, which proves our point that none of this is the subject of a claim within the meaning of this policy. I take it that you're done, Mr. Gerstein. Yes, Your Honor. And obviously, if a few of the other panel members have questions, I'll be happy to answer them. But that's all I would say. Thank you very much. The case is taken under advisement. Thank you.